IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION


ANTHONY COMPTON                                                      PLAINTIFF

        v.                        Civil No. 1:07-cv-01002

SHERIFF JAMES ROBINSON;
JAIL ADMINISTRATOR DAVID
OLIVER; and JAILER WILLIE REED                              DEFENDANTS


**REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

        The Plaintiff, Anthony Compton, (hereinafter "Compton" or "Plaintiff") filed this civil rights

action pursuant to 42 U.S.C. § 1983.  He proceeds *pro se* and *in forma pauperis*.  Pursuant to the

provisions of 28 U.S.C. § 636(b)(1) and (3) (2005), the Honorable Harry F. Barnes, United States

District Judge, referred this case to the undersigned for the purpose of making a report and

recommendation.

        Compton is currently incarcerated in the Arkansas Department of Correction (ADC).  The

events at issue in this lawsuit occurred while he was incarcerated at the Ashley County Detention

Center (ACDC).  Compton contends his constitutional rights were violated by the unconstitutional

conditions of confinement he was subjected to while he was in administrative or disciplinary

segregation.

        An evidentiary hearing was conducted on April 23, 2008.  At the conclusion of the hearing,

I took the matter under advisement pending preparation of this report and recommendation.

-1-

## 1. Background & Evidence Presented

Compton was booked into the ACDC on November 14, 2006. *Defendants' Exhibit* 1 at page 2. He had been sentenced to a term of twelve years of imprisonment. *Id.* at page 1. The events at issue in this case took place in late November and early December of 2006. He remained incarcerated at the ACDC until January 1, 2007.

At the evidentiary hearing, I heard the testimony of the following witnesses: (1) Jimmy Don Kelley; (2) Sharroderick Dunn; (3) Brandon Davis; (4) Danny Campson; (5) Anthony Compton, the Plaintiff; (6) James Robinson, a named Defendant; (7) David Oliver, a named Defendant; (8) Willie Reed, a named Defendant; and (9) Debra Baker. For purposes of discussion, I will summarize in the first person the testimony given at the evidentiary hearing. The summary of the testimony will not necessarily be presented in the order the witnesses testified at the hearing.

### *Jimmy Don Kelley*

I'm currently in the ADC. I'm in the Benton Work Release Unit in Benton, Arkansas.

I was in the ACDC in November and December of 2006. I was being held on fraud and burglary charges. I was convicted on December 13, 2006.

On November 12, 2006, I was in the general population. I think I was in cell five. I didn't see Compton spit on a trustee. I was locked down in my cell at the time it occurred.

There were two floors in the pod or cell block. A top floor and a bottom floor. There was a day room you had access to when you were not locked down in your cell. When you were in general population, you were not locked down all the time. Compton was in general population at the time.

I thought it was wrong how they treated Compton while he was in isolation.  For ten or twelve days while he was in isolation, he only received one bologna sandwich for each meal.  He was chained up the whole time he was in isolation or segregation.

The segregation area is down away from general population.  It is a separate area.  It doesn't open into the same room.  I didn't witness anything about Compton while he was in segregation.  Although you could see through the little window into segregation, you couldn't see into the cell Compton was in.  When you go into segregation, they take your clothes, blanket, and everything for a short period of time.  I know Compton was real shook up.

I did see his Styrofoam tray on the cart.  I saw his bologna sandwich on the cart.  I don't know why he was being fed bologna sandwiches.

When he was brought out of segregation, I knew he hadn't had a shower for awhile.  I don't recall what day this was but he didn't smell like he had showered for a number of days.

I see where there is an entry of the jail shift report that Compton was taking a shower on December 13th.  *Plaintiff's Exhibit* 5 (entry at 20:58 on page 448).  I just know he didn't smell like he had showered.

It could have been December 14th when Compton was moved back to general population.  I wouldn't disagree with that.  *See Plaintiff's Exhibit* 5 (entry at 15:00 on page 450).  H1-16 is general population.  Compton had marks on his legs where he had been shackled down.  The marks were indentations or small scratches where he had been moving around in the shackles.

### Sharroderick Dunn

I'm currently an inmate in the ADC, Varner Super Max Unit.  I was in the ACDC at the same time as Compton.

I was in segregation for three or four days when Compton was in segregation.  I was not allowed to have soap or to shower.  I don't recall the specific days I was in lock-down.

Compton didn't have a mat. They had Compton chained to a stool.  He was sleeping on the floor. He was not allowed to shower.  I don't recall him being offered a shower or change of clothes.

He had to use the restroom on the floor.  I could see the floor was wet from him going to the restroom.  He could not reach the toilet.  I could smell him.

Everyone knew he was shackled for something like fourteen days.  Compton had boxers on. I never saw him with clothes on.  I was in H-1.  You could see the cell in segregation that Compton was in.  I never knew Compton to set off the fire alarm.

I could see on the floor and I didn't see any mat.  I have a lawsuit against the ACDC about being placed on lock-down.  I was put on lock-down on three different occasions.

I see that it shows Compton was out to take a shower on December 7th and then again on December 13th.  *See Plaintiff's Exhibit* 5 (entry at 20:18 on page 426 and entry at 20:58 on page 448).  He never took a shower while I was in segregation.

### Brandon Davis

I'm in the ADC, Jefferson County Jail and Correctional Facility.  I was at the ACDC with Compton.  For awhile, I was in the same cell with Compton.

I couldn't see into the isolation cell from H-1.  I have no personal knowledge about the conditions of his cell while he was in isolation.

H-1 is the pod or cell block I was assigned to.  H-1 is a general population cell block.  When Compton came out of isolation, I recall that he hadn't taken a shower in awhile.  He didn't smell

good.  He hadn't taken a shower or something.  He had a scar on his leg above the ankle from the shackles.  It was a little scar on his leg–a little scratch.

Compton didn't seek medical treatment that I know of.  I would have sought medical treatment.  I would have asked to see the nurse.  It was bleeding a little–like somebody pulled off the skin.  I never had scratches like I saw on Compton.

I take Depakote and a night-time medication.  The medication is for mental health.

***Danny Campson***

I'm an ADC inmate.  I'm in the Wrightsville Unit.

I got to the ACDC in September of 2006.  I was there when Compton got brought in.

I was in Housing Area 1–H-1.  I was assigned to two or three different cells at various times.

Compton was originally in general population.  He was alright.  We played cards, dominos, etc.  He had some arguments.

He was put into segregation after he had problems with a trustee.  A trustee was passing out clothes or trays.  The trustee and Compton had words and the trustee jumped back and said Compton spit on him.  Compton went to segregation.

I never saw him while he was in segregation.  I couldn't see from my cell and didn't go to segregation.  I was not in isolation at the same time Compton was.

Other inmates and staff told me Compton was without clothes and chained for more than several days.  There is a window in the door leading into the isolation area.  Compton was in the cell right in front of the door into isolation.  He was chained to the stool without any clothes on.  He did thirteen or fourteen days.

I heard constantly that he was a disruption.  But if I was in that situation, I would cause problems too.  At one time, the fire sprinkler was activated.  I don't know if he activated it or what.

I remember when Compton got out of isolation.  You could tell he had been handcuffed.  You could see the handcuffs hadn't been off in a long time.

I have been in isolation at the ACDC.  Generally, they take your clothes and all your property.  I had my clothes and property when I got put in isolation because I was put there for a bogus reason.  I said I was not going for it and they let me keep my clothes.  Willie Reed took me to isolation.  I was only in there a day or so.

***Anthony Compton***

I'm currently an ADC inmate.  I'm at the East Arkansas Regional Unit.

On November 14, 2006, I was sentenced at the Pine Bluff County Courthouse to a term of imprisonment of twelve years on a robbery conviction.  I was sent to the ACDC.  This was the first time I was incarcerated at the ACDC.

I stayed in my cell most of the time.  I played cards and dominos.

I had a problem with a trustee.  On the 20th, a trustee thought I was someone else.  I knew he had me confused with someone else so on the 21st I stayed out of my cell.  I tried to tell the jailers about my problem.  On the 23rd I got to arguing with the trustee and he spit on me and I spit back.

Willie Reed said I was going to be locked down.  I told Reed the trustee spit on me.  Reed passed out food on both floors and then came back, took me to segregation, and locked me down.  They called David Oliver on the telephone.  They told Oliver I was spitting on jailers and inmates.

They took my clothes.  Reed said Oliver told him to take my clothes.  I said I was not giving them my clothes.  Reed called the Sheriff.  I had nothing but boxers.  I was locked down for five days

before I talked to anyone about why I was locked down.  I didn't get a chance to explain my side of the story.  I had no blanket and no clothing.  I was cold.

I never saw Oliver on the 24th.  I didn't get offered a pair of pants on the 24th.

I never saw Oliver until the 5th day after I was locked down.  On the fifth day, David Oliver and Lonnie Paranuk came back there.  Oliver came back and told Paranuk to give me some clothes.  Paranuk gave me clothes that were too big.  He gave me a pair of pants that were four sizes too big.  I refused to wear the pants.  I said they were too big.  I said they were not going to fit and keep me warm.  I asked him to give me others.  It was getting towards night.  I was upset.  I was so cold.  I was freezing.  I threw my cup.  It was a hard plastic cup.  It hit the sprinkler.  It went off.

Oliver came in.  He said it cost $15,000 in water.  It took two or three hours to get the water cut off.  He said he was going to get me and make me pay for this.  They cleaned the water up.

Reed and another officer, I believe his name was Joe, moved me from cell 8 to cell 7.  This is when I was shackled.  I was chained to the stool.  I was wearing boxers.  I could not reach the toilet.

I would say I had to use the bathroom.  They wouldn't come so I would have to go to the bathroom on myself.  I would have to sleep and eat in it.

Eventually, they came in and put on another shackle to I would be able to use the stool.  *See Plaintiff's Exhibit* 5 (entry at 13:25 on page 425-- "Jose is in seg letting Compton use the bathroom. Jose added another shackle to Compton so that he can move around some and gave him some tissue). Before that I messed on myself.  I used the bathroom on myself for seven days.

-7-

I started getting bologna sandwiches the day I hit the sprinkler. *See Plaintiff's Exhibit* 5 (entry at 13:31 on page 400). I got bologna sandwiches for every meal. I didn't throw food against the wall.

I couldn't even flush the toilet. When they put me in there, they knew it didn't work. Willie Reed said it didn't work.

On about December 10th, one inmate gave me an orange shirt. I wore it. I had no clothes at all from November 23rd to December 10th except for two pairs of pants that didn't fit.

I was allowed to take two or three showers the whole time I was in segregation. The first time I was allowed to shower I took a shower and then came back and they extended the shackles. Joe was supposed to give me clothes but they didn't give me any because they didn't have any that fit.

About the twelfth day I think it was James Robinson who had me taken off of the chain and out of segregation. I went to housing one into cell sixteen. I don't recognize the man identified as James Robinson in the courtroom.

For two days after I was released, they denied me a grievance form. After two days, I got a grievance form from another inmate. While I was in isolation, I didn't have anything to write with. I didn't get a response to my grievance until I went to the ADC in 2007. My grievance doesn't say anything about needing medical care. When I went to ADC, I didn't ask for medical care for the scar on my leg or for my back. I didn't think I needed medical care.

I still have back pain off and on from being shackled so long. They looked at my back. I wrote some sick call slips. I was given some pain killers. I didn't receive any real treatment. I have a scar on my leg from where the shackles were too tight.

-8-

***James Robinson***

In November of 2006 I was the Sheriff of Ashley County. I have served as Sheriff of Ashley County on two different occasions. Most recently, I was in office for six years with my last day in office on December 31, 2006. The last time I was at the ACDC was December 31, 2006.

As sheriff, I was the chief law enforcement officer for the county. The running of the jail was a major part of my job. I delegated the day to day operations of the jail to the jail administrator. In November and December of 2006 the jail administrator was David Oliver.

He was the jail administrator on two different occasions. The last time he served as jail administrator was from late October or early November of 2006 through the end of December 2006. The other time he served as jail administrator was prior to that. Oliver was responsible for the day to day operations of the jail. He reported directly to me.

I retained responsibility for policies and procedures. I have no personal knowledge of Compton. I never saw Compton while he was in segregation. If I saw him while he was in general population, I don't recall.

Oliver reported to me anything that was out of the ordinary. He would give me verbal and written reports. I don't recall getting a written or verbal report regarding Compton being in segregation. I didn't know that Compton was chained up.

Compton wasn't the only one we had problems with. I was notified of anything out of the ordinary. I don't think Compton being shackled was out of the ordinary.

I was in the Sheriff's Department when I was in office every day. I was back in the detention center part of the complex almost daily. The complex has an administrative part in the front and the jail in the back.

-9-

***David Oliver***

In November of 2006 I was the jail administrator for the Ashley County Sheriff's Department. I was the jail administrator three separate times. My first time as jail administrator was in 1987. I worked as jail administrator again in August of 2006 and left in September of 2006. I came back as jail administrator at the end of October and remained in that position until December 31, 2006. I left in September because I had found employment somewhere else. Sheriff Robinson asked me to come back and work for him until the end of his term. I did.

I was responsible for the day to day operation of the jail. The inmates were treated fairly, firmly, and with consideration. The staff controlled the jail and not the inmates.

On November 14, 2006, Compton was brought in. I had no impression of him then. He was just one of many Jefferson County inmates brought in. Jefferson County was in the process of building their jail. Our jail had been built in May 2006. It was one single building with two sides. The front side was administrative. Behind it was the detention center. It had three housing areas–H-1, H-2, female housing, and an administrative segregation area. There were two tiers with thirteen cells, I believe on each tier in H-1, and H-2, and eight in segregation. I forget how many cells there were in the female housing area.

The administrative segregation section was apart from general housing. H-1 sits on the far west side of the complex. When you turn the corner it is fifteen to twenty feet to the door. There is a twelve inch by eight inch window. There is no way you can see from H-1 into administrative segregation. It is impossible.

-10-

I received a phone call from Willie Reed saying Compton had spit on another inmate and he wanted to put Compton into administrative segregation. I told Reed he could. No one could put an inmate into segregation without consulting me.

It was a major infraction to spit at another inmate or staff member. There is also a safety and health concern. If I'm at the facility when an infraction occurs, I would not come up and talk to the inmate at the time. I give the inmate time to cool down. On this particular occasion, I was not at the facility when the incident occurred.

In the morning, I always did a tour of the facility. I made it a point to talk to the inmates. I talked to each inmate in segregation.

For the first twenty-four hours an inmate is in segregation, his outer clothing is removed. The inmate has only his boxers and t-shirt. Nothing else is allowed. The inmates are often angry or depressed. We want to avoid the inmates doing harm to themselves.

Most inmates complain about being too hot all the time. I gave instructions that the thermostat was never to be set below 68° or above 70°.

I talked to Compton the morning after he was put in segregation. This would have been November 24th. He had probably been in segregation for twelve or thirteen hours. I asked him if he knew why he was in there. He just turned and didn't want to talk to me. I said if you don't want to talk to me so be it.

Compton had thrown his tray on the floor. He continued to get his regular tray. He was still without clothes and his mat at this time.

A few hours later, I had them bring him pants. He threw the pants out. He was then given a jail jumpsuit. He did wear it. He didn't like it. He was provided a mat at this time.

-11-

The theory is that after an inmate is in segregation for a short period of time and if everything goes smoothly they will receive their uniform back, a mat, a blanket, be given recreation, and all other privileges. If all goes well, the inmate will then be put back in housing.

The segregation cells have two bunks, a sink, a toilet, a stool, a little table, and a tray. The same as other cells. The stool is about three and one-half feet from the toilet.

Until Compton broke the sprinkler, the only complaints I had heard about his behavior was that he occasionally threw his food. Inmates in segregation are not usually shackled to the stool. Inmates are only shackled when they have engaged in destructive behavior to themselves, destroyed property, or engaged in extreme violence. In this case, Compton climbed on a bunk or the sink and hit the sprinkler. The floor in the cell is concrete. So, I would rather be sued for him being shackled than for him falling on the concrete floor and hurting himself. So, I shackled him.

I was working in the facility the day he broke the sprinkler. However, at the specific time it occurred, I had gone to lunch.

It is impossible to throw a cup and break the sprinkler. The cups are plastic and weigh approximately an ounce. The sprinkler head was metal. The cup didn't weigh enough to break, bend or twist a metal sprinkler head.

When the sprinkler head broke, water went everywhere. The sprinkler system takes about two to two and one-half hours to shut off. We had water going constantly.

Compton was given dry clothes and a dry mat. He was moved to a different cell and then shackled to the stool. He was aggravated, agitated, and combative. He was not physically combative but he refused to obey orders up to the point that we almost had to physically make him obey.

He was throwing food.  He was constantly complaining about the food.  The only thing I had left was to just feed him bologna sandwiches.  He said he would eat them.

The shackles he has on in the courtroom today[1] are a little shorter than he had on then.  He had two sets so he could reach the stool.  I believe the shackles on him were about four and one-half to five feet long so he could reach the sink and commode.  His mat was on the floor.  He could not reach the bunk in the cell.  He was shackled on December 1st.

Compton was in the detention center on a violent crime–aggravated robbery.  He made threats towards staff members.  *See Plaintiff's Exhibits* 1, 2 & 3.  Compton had a violent demeanor.  I believed he would carry out his threats.

I absolutely believed Compton could reach his sink to obtain tap water.  Jailers also would from time to time carry around ice water.

Compton had his sink for hygiene.  He didn't have a toothbrush or a razor.  Segregation inmates are allowed to shower every second or third day.  Sometimes segregation inmates are offered a shower every day depending on the shift.  Compton stayed handcuffed and shackled even when showering because of the threats he had made.

I have no knowledge of Compton refusing to shower.  I have no knowledge of him urinating or defecating on himself.  I never saw any indication he had done it on himself.  I believe Reed may have some knowledge of Compton having gone to the bathroom on himself.  I want to make sure any inmate waste is gone and gotten rid of so that the inmate cannot save it up and throw it on others.

---

[1]No testimony was offered by any witness as to the approximate length of the leg shackles or leg irons being worn by Compton in the courtroom.  The chain appeared to be between 12 inches and 18 inches in length.

On December 5th there are notations in the jail shift report that Compton was given water and that the pipe chase was opened to flush the toilet in his cell. *See Plaintiff's Exhibit* 5 (entries at 17:52 and 18:48 on page 418). Obviously Compton was using the toilet, if we had to flush it. Compton had four to four and one-half feet of shackle and the stool was only three and one-half feet from the toilet. He could reach the toilet.

On December 7th there is a notation on the jail shift report that Compton informed the tower he needed to use the bathroom. *See Plaintiff's Exhibit* 5 (entry at 1:19 on page 423). It says "tower informed a jailer about what Compton asked us." Anytime I saw Compton, he could reach the bathroom.

I see that another shackle was added on December 7th. *Plaintiff's Exhibit* 5 (entry at 13:25 on page 425). Compton could exercise in his cell while shackled. He could run in place, do sit ups, pull himself up on the bunk.

I had the jailers take Compton off the bologna sandwiches and give him regular meals. I told him if he behaved, I would move him back to population.

After Compton was released from segregation, I received this grievance dated December 16th from Compton about the time he was in segregation. *Plaintiff's Exhibit* 4; *Defendants' Exhibit* 2. I responded. *Id.* Compton never complained about any injuries. I didn't date my response but I responded the same day I received it. I understood that Compton refused to take the grievance back and it was left in his cell.

-14-

*Willie Reed*

I'm no longer employed at the Ashley County Sheriff's Department. I work with juveniles now. I was a jailer at the ACDC from May 23, 2006, until two months ago. I went to jailer training school. My job was to maintain the security and safety of inmates and others.

On November 23, 2006, I recall that David Hartley and I were serving lunch. I was on the first tier. Hartley was on the first tier. I saw what went on. Compton spit on Hartley. Compton told me: "I'm going to get you before you get me." I took Hartley with me down stairs and then notified Oliver what had happened.

Based on Compton's actions, I felt he needed to be put on administrative segregation. I had to go through Oliver before the decision could be made.

When an inmate first goes to segregation it is protocol to remove their clothing. Compton wouldn't comply. I had to go get another staff member to get Compton to comply. It is mandatory that you check on inmates in segregation every hour. I tried to keep an accurate log.

Compton was violent and told me he was going to draw blood from us. Compton would get food and throw it on the walls. He would go to the bathroom on himself. The first six or seven days I don't recall but then he got worse and worse.

After the first twenty-four hours in segregation, Compton had a jumpsuit and a mat. He would lay on it in front on the cell door next to the toilet. I'm not certain if I was present when the sprinkler went off. Compton was not shackled before it went off.

After Compton set the sprinklers off, two leg irons were put together and he was shackled to the stool. The shackles were about four feet long. He could reach the toilet. He could get to the bunk. He could move around.

-15-

The jailers are responsible for feeding and showering the inmates. I would beg him to go to the shower. Sometimes he went to the shower. He would go to the bathroom on himself. Then I would have a trustee go clean it up. He had access to the toilet. It was intentional.

His mat was in front of the door beside the toilet. He could lay beside the toilet, so he could reach the toilet.

It would get busy. When we got time, we would go deal with it. With him, we couldn't say too much. He would get angry and curse you out. He was plotting and wanting to get our blood. *See Plaintiff's Exhibits* 2 & 3. He wanted to harm staff members. *Id.* We needed to be careful around him. *Id.*

I wrote this note and put it in Compton's file. *See Plaintiff's Exhibit* 3; *Defendants' Exhibit* 3("Inmate stated he was going to see blood . . . Inmate stated that he is plotting."). This note did not go in the shift notes. It went into Compton's personal jail file.

I thought the use of shackles was appropriate in this case. Inmates can change at anytime. He could have gotten at the sprinkler at any time.

Compton wanted the shackles off. I told him no because he could mess the sprinklers up.

If an inmate has medical problems, he fills out a medical slip. We don't usually have very many medical requests, but if we have one the inmate sees the nurse. If an inmate fills out a grievance, we turn it in.

### Debra Baker

I work for the Ashley County Sheriff's Office. I was a jailer. I started there in June of 2006. As jailers, we provide for inmates' needs and ensure there is a safe environment.

-16-

I have read the reports about the November 23, 2006, incident but I wasn't at work when it occurred.  I was not working when Compton was placed in segregation.

I recall Compton being violent and messy the days I worked.  When I was working, I saw him daily.  Most of the time he had on an orange jumpsuit.  Sometimes he refused clothes or took them off.

Sometimes he threw his food all over the walls.  The trustees came in and cleaned up the food almost daily when I was working.  I passed out trays.  The first week Compton was given regular food.  I believe he didn't want the food he was being served and requested sandwiches.  He was put on bologna sandwiches by Oliver.  Most of the times the inmates, showered daily.

He was shackled a portion of the time he was in segregation.  He set the sprinklers off.  He was in shackles for safety and sanitary reasons.  While shackled he had access to the restroom at all times.

One time I went in there and the floor was soaked.  Compton said it was urine.  He was taken clean clothes and he refused them.  He was taken out and showered and returned.

He threatened to sexually assault me.  *See Plaintiff's Exhibit* 1; *Defendants' Exhibit* 4.  I was concerned about the threat and about his violence.

## 2.  Discussion

The Eighth Amendment to the United States Constitution prohibits the infliction of "cruel and unusual punishments."  U.S. Const. amend. VIII.   The Cruel and Unusual Punishment Clause of the Eighth Amendment forbids conditions that involve the "wanton and unnecessary infliction of pain," or are "grossly disproportionate to the severity of the crime."  *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981).  Only actions or conditions that deny inmates "the

-17-

minimal civilized measure of life's necessities" violate the Eighth Amendment. *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991).

A prisoner alleging an Eighth Amendment violation must prove both an objective and subjective element. *See Revels v. Vincenz*, 382 F.3d 870, 875 (8th Cir. 2004)(*citing Wilson v. Seiter*, 501 U.S. 294, 298, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991)). "The defendant's conduct must objectively rise to the level of a constitutional violation by depriving the plaintiff of the minimal civilized measure of life's necessities. The defendants' conduct must also reflect a subjective state of mind evincing deliberate indifference to the health or safety of the prisoner" *Revels*, 382 F.3d at 875 (citations and internal quotation marks omitted). Deliberate indifference is established when the plaintiff shows "the defendant was substantially aware of but disregarded an excessive risk to inmate health or safety." *Revels,* 382 F.3d at 875. The standards against which a court measures prison conditions are "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble*, 429 U.S. 97, 102, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).

Keeping these principles in mind, I conclude that Compton has failed to establish that he was subjected to conditions of confinement sufficiently severe to violate the Eighth Amendment. It is undisputed in this case that Compton was shackled from December 1, 2006, the date he set off or broke the sprinkler head in his cell, through December 14, 2006, when he was returned to general population. The shackles consisted of pair of cuffs around his ankles with a length of chain between the two cuffs. The chain was secured to the stool that was bolted to the floor. Compton testified the chain was too short for him to be able to reach the toilet in the cell or the bunk.

-18-

Of the witnesses called by Compton, only one, Dunn was in segregation at the same time Compton was.  Dunn testified he was in segregation for three or four days.  Dunn could not recall the dates he was in segregation.

It was clear from the testimony that the remaining inmate witnesses called by Compton, could not see into the segregation cells and had no personal knowledge about the conditions under which Compton was confined or of Compton's behavior during this time.  Oliver, Reed, and Baker, all testified that Compton had four to four and one-half feet of chain and could reach the toilet in his cell.

Although he could easily reach the toilet, Reed testified that Compton did on occasion intentionally urinate or defecate.  On these occasions, Reed indicated that he would have to get the trustees to clean up the mess and get Compton cleaned up.  I find Reed's testimony in this regard to be credible.

Compton testified he was on two or three occasions allowed to shower.  The jail shift report documents that he was allowed to shower on two occasions--December 7th and December 13th.  *See Plaintiff's Exhibit* 5 (entries at 20:18 on page 426 and 20:58 on page 448).

Compton received three meals a day.   At first while in segregation, Compton received regular meals, after jailers reported problems with Compton throwing his trays, Oliver put Compton on a diet of bologna sandwiches.  *See Plaintiff's Exhibit* 5 (entry at 13:31 on December 1 on page 400).

Compton had access to drinking water from the sink in his cell.  Additionally, jailers would supplement this by providing him with additional water.  *See e.g., Plaintiff's Exhibit* 5 (entry at 17:52 on page 418).

-19-

Although somewhat constrained by the leg shackle, Compton could perform exercises in his cell.  Compton made no argument that his health suffered in anyway because he was unable to exercise.  While Compton testified he was cold, no evidence was presented contradicting Oliver's that his orders were for the detention center to be kept between 68 and 70°.  With the exception of the first day, it appears that Compton was provided with clothing, although it was not to his liking.

The use of restraints does not itself violate the constitution.  *See e.g., Key v. McKinney*, 176 F.3d 1083, 1086 (8th Cir. 1999)(prisoner who was restrained in handcuffs and shackles for 24 hours, making it more difficult for him to relieve himself, did not suffer a constitutional violation).  "Restraints on an inmate do not violate the amendment unless they are 'totally without penological justification,' 'grossly disproportionate,' or 'involve the unnecessary and wanton infliction of pain.'" *See Smith v. Coughlin,* 748 F.2d 783, 787 (2d Cir. 1984)(*quoting Rhodes v. Chapman*, 452 U.S. 337, 346, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1980)).

Compton was shackled after he set off the sprinkler in his cell.  Although he contends he did it accidentally rather than deliberately, there is no dispute that he was in fact responsible for having set off the sprinkler system in the detention center.  After he was shackled, Reed and Baker reported that Compton made threats towards them and other staff members.  *See Plaintiff's Exhibits* 1-3.

In this case, there were legitimate penological reasons for utilizing the physical restraints.  Compton's hands were free and the method of restraint allowed Compton a range of movement.  I find credible the testimony of Reed and others that Compton had sufficient length of chain to be able to reach the toilet in the cell.  He could lay down when he wanted to sleep and move around the cell within the constraints of the shackles.  He had access to running water, was allowed to shower at least twice, was fed three times a day, and was regularly checked.  On December 7th another shackle

was added to give him additional chain length to allow for greater movement.  This does not show deliberate indifference or wanton conduct.

Furthermore, there is no evidence that Compton suffered any physical injury as a result of being shackled.  Although he testified he had a sore back and suffered injuries to his ankles from the shackles, he sought no medical attention.  In fact, he testified he needed no medical attention for his injuries.

Finally, there is absolutely no basis on which former Sheriff James Robinson may be held liable.  A supervisor may not be held liable for a section 1983 violation on the basis of *respondeat superior*.  *See Monell v. Department of Social Services*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).  Compton does not contend Sheriff Robinson directly participated in the alleged constitutional violations or that a failure to properly supervise and train the offending employee caused a deprivation of constitutional rights.  *See  Andrews v. Fowler*, 98 F.3d 1069, 1078 (8th Cir.1996) (*citing Tilson v. Forrest City Police Dep't*, 28 F.3d 802, 806 (8th Cir.1994));  *Mark v. Nix*, 983 F.2d 138, 139-40 (8th Cir. 1993)(section 1983 liability requires some personal involvement or responsibility).  Rather, Compton merely contends Sheriff Robinson should have known what was going on at his jail.

The record in this case is devoid of any suggestion of the existence of a custom or policy on which to hold Ashley County liable.  In short, there is nothing to suggest Compton's alleged constitutional deprivation was caused by a custom or policy of Ashley County.

### 3. Conclusion

For the reasons stated, I  recommend judgment be entered in defendants' favor and this case be dismissed with prejudice.

  **The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

  **DATED** this 19th **day of May 2008.**

          /s/ Barry A. Bryant
          HON. BARRY A. BRYANT
          UNITED STATES MAGISTRATE JUDGE